Your honors, may it please the court, my name is Stephen Hudspeth. I counsel for all of the plaintiffs' appellants in this action. I last argued here ten years ago. Signed the Kevin case. Welcome back. Thank you, it's good to be back. Do you remember your panel? What I do remember is Judge Stapleton wrote the dissent, your honor. We lost here. Is that your side? But Judge, we went up to the Supreme Court on that and won 9-0. The question was for an inconvenience and there was a big split in the circuits on it. If I may introduce Michael Gross, who is with me at counsel table from the Sager firm. Also, it was Sean Kelly from that firm. I ask that we reserve five minutes for my rebuttal. Could you start out by telling us in a few clear sentences what is your claim under the antitrust law and what is your claim under the FCC? Shall I start with the antitrust? No, either way. Fine, your honor. Under Sherman Act, Section 1, our claim is that MCOM, who is the remaining defendant here, conspired with ESI, a defendant that settled out and settled on the basis of turning over licenses that have enabled us, for example, to enter into a transaction with Amtrak. I just concluded and will provide for positive train control here in the Northeast Corridor. What happened in the Sherman Act, Section 1 case, is a conspiracy was entered into, a conspiracy not unlike that found in the Supreme Court's American Tobacco Decision and Topco and Sealy. It was a conspiracy to divide a market. The conspiracy was, you take Block A within each of the AMTS spectrum ranges, the one megahertz each, and I'll take Block B. And that's how it worked. And that's how it continued going forward. And the result was not only that agreement, which honestly in private litigation without a government proceeding beforehand, in which the government has the power of immunizing witnesses to testify and tell the truth, I don't think one is likely to find a better acknowledgement than Mr. Cooper's testimony. But you're dealing at this point with a bench trial and finding a fact against you, and you can't simply just argue your version of the facts, right? I understand, Judge Roth, and I very much appreciate that fact. What we are dealing with here, however, is a situation which both U.S. Chipson and the Anderson v. Bessemer case indicates. When a major fraud is committed on the court, the court of appeals in this case has the ability to go back and look at the facts. You don't find facts. If there are facts to be found, you need to send them to the district court. We don't, Your Honor. The facts were presented as we had them. The disclosures that came came after the trial. The admission that over 80% of their site-based stations were terminated. They didn't exist. You informed the district court of those disclosures, did you not? In fact, you sent the letter to the district court. We sent a letter to the district court. That was before the FCC entered an order confirming the arrangement was entered into between the FCC's Enforcement Bureau and FCLN. The district court took into account the letter that you sent with all the allegations in the letter and nonetheless ruled the way the district court ruled, which was against your claim. And, Your Honor, I grant that, but by the same token, what was in that information was so extraordinary that to explain it all properly really requires an opportunity to appear before a court and lay it all out. And that's what we have now. Judge Roth is correct, though. What are we to do now at this point? The district court took into account this information, took it into account in its decision. Even if we disagreed, the standard of review is so deferential, your suggestion is what? Do we send this back to the district court for reconsideration? No, Your Honor. I think you can do what happened in U.S. Chipsum and in Anderson v. Belsumer. You can say there was an error. The error is not the fault of Judge Hayden. It's the fault of how this came out. She heard a record. She had testimony before. But then something extraordinary happened. The extraordinary thing shows absolute lies. They could have said it in a dozen words. We don't have contours. I guess I should ask, what is the extraordinary event that came about? The extraordinary event is the disclosure, the admission at last that they had no contour information to give. Contour information is what creates the blockage here. The blockage, in answer to your question, Judge Lowder, that's the heart of what this Sherman Section 1 case is about. Not just these plaintiffs, but the whole market. Do they have to give contour information? Yes, they do. Well, the FCC says no. No, the FCC does not say no, Your Honor. I thought the FCC said you can make an approximation, submit that approximation to the FCC, and if they agree, they may give you permission to do whatever construction you have to do. No. What the protection orders say, there are three of them, they're in the record here, they are very clear that there are requirements for disclosure of what your contour is. And as Sandra DePriest herself acknowledged as CEO of MCLM, contours are irregular in shape. They're governed by everything from mountains and other topography things to height of tower. Are contours things that make it stick together, fit together? What are contours? Contours are the broadcast area around a station. It's a range? The range of its broadcast. They're not little concentric circles. They're irregular shapes. Under the geographic licensing arrangements that the FCC established for the AMTS spectrum, it is required that geographic licensees, such as these plaintiffs, honor the contours, the existing contours of the site-based licensees. In the Amtrak situation, because those contours were not disclosed, we couldn't do anything with Amtrak until March of this year, as shown in the FCC order confirming that. That happened because the roadblock reflected by the failure to disclose that we don't have, defendants don't have contours as to over 80% of their site-based licenses. That's what broke the logjam. That's what now makes it possible to put positive control on trains all up and down the Northeast Corridor. Okay, but where is any evidence of a conspiracy? Your Honor, the conspiracy starts when Cooper and Daniel sit down together and say, I'll take A block with the AMTS, you take B block. Wasn't that 25 years ago or something? Yeah, and the district court heard all of this and said, I find absolutely no evidence of a conspiracy. Didn't it? That's correct. And so what exactly is the clear error and why is it clear error? The error is that, first of all, for some reason she thought there had to be an absolute proof of an ironclad agreement or she couldn't go forward. That's not what these courts hold. Not only the Third Circuit, but all around the country and the Supreme Court, of course. What you need is what American Tobacco had explicitly stated. There was no express or implied agreement. There was what happened, which is people got together. After that, there was a course of conduct. Here, people got together. After that, there was a course of conduct. American Tobacco, the conspiracy persisted for 25 years. If you go look at Topco, another 25. 20, 25 years. A long time. In ceiling, 35 years. These market division conspiracies are very, very easy to implement. There's zero cost to the plaintiffs, to the defendants who are over in this case, to the parties that try to implement them. Mr. Court, listen to all this. Listen to your argument and said that changing people, the fact that there was no proof of any contact even between some of these people, that listening to what you had to say and listening to what the other side had to say, that she found no evidence of any combination or conspiracy. And you certainly haven't laid out anything to me right here that makes me think different. Well, first of all, let me just clarify. The contacts continued throughout. Vanderhaven, a colleague of Daniel, went over to Mobax. Reardon comes in at Mobax. Reardon goes on to MCLM. The chain continues. Reardon himself admits that he had business meetings with Cooper. What these guys are discussing are fundamental sensitive business data. What's our business plan? That's what they talk about. That's what they move forward. Very, very easy conspiracy to implement. Now, answer to your question, Judge Rall. What does that mean in terms of what Judge Hayden did? In my view, Judge Hayden did not have before her the import of what these lies were about. What Judge Hayden was told, and I can read it here for you, she says the responsibility of a site-based licensee is to do the best they could to try to accommodate the geographic licensees. But with limited resources, you know, I don't think they could spend the time and engineering necessary to do that. The court then asked her, there would be a substantial engineering expertise and intended cost, right? Senator Priest says yes. There were no costs. It's zero cost to say a dozen words. What is the concerted action, which is really the Sherman? Let me pull this closer. The concerted action, just so I understand it a little better, is that the site-based transmissions were withholding information about their contours and ranges, and they did it on purpose, right? Yes. They were wholesaling, I guess, is the word. They were warehousing, which means holding the stuff without selling it out in the hope of collecting at the end either a ransom from people like us, players, or when the market takes off, it is now cashing in. So that conduct then prevented you, the plaintiff in this case, from doing its work, which is setting up the towers, transmission facilities, and so forth. That's absolutely right. To invest in a geographic license is a huge expenditure, Your Honor. I know, but that's the essence of your conspiracy, your concerted action. We have many plus factors. I can read a whole host of them here. I do want to put this one question to you because I think I did before, but maybe I didn't put it artfully, but there is a statement here. It was made by the FCC's Wireless Transmission Bureau. It says the following. Where the site-based incumbent is unwilling or unable to provide this information, this information that you're looking for, a geographic licensee, which is you, must make assumptions about the site-based agent's technical parameters. So you make assumptions, you submit them to the FCC, and then make a decision. So in that light, how is there a conspiracy? Nobody will invest on that basis, Your Honor. The FCC takes years to make decisions. Nobody will invest if a geographic licensee cannot be told what the contours are, and the contour orders. But then the FCC is not obligating them to do anything. The FCC is saying we're not going to get into this problem between site licensee and geographic licensee, and it issues this order which says make assumptions and let us know what they are. The protection orders that are addressed specifically to these defendants, PSIN, defendant before you, MCLM, are very specific on what they're expected to do. It's to give us their contour information. You can't go to investors and say when you're asking them to make millions of dollars of expenditure to build out a geographic license and say, oh, well, we think the site-based licensee that exists might be in this area and might broadcast in something like this thing. I have one other question. It's a very complicated case. I had that message from the beginning. Judge Levin has more questions also. Of course, Your Honor. This idea, establishing a conspiracy is not an easy thing to do. How do you know that because they, as you say, withheld information, that they conspired together and agreed together that this was a concerted action to keep you from wrecking your facilities? Because we have the pattern of conduct and we have the actual carrying out of the conspiracy. Again, conspiracy is not an easy thing to establish. You have a pattern of conduct, which is that they didn't give you, they were not forthright in giving you the information. And both did exactly the same thing. And from that you infer conspiracy? Both acted against their own self-interest. For example, in Auction 57, in PSI saying please re-bid, even though PSI got it the lowest price, the geographic license it bid for. So the FCC said please re-bid it so Mobex can get in there. They missed it the first time around. Give them a shot. That's absolutely necessary. If it's re-bid, they could have to pay more. They might not even get the license. Was this submitted to the FCC, this idea that these site-based facilities are conspiring to prevent someone else from setting up their facilities? Was this all presented to the FCC? The idea that site-based facilities were conspiring against the geographic license? Absolutely. Mr. Havens has been trying for years to make it clear to the FCC that things that were going on didn't look right. And did the FCC take any action? The FCC has taken its own slow, sweet time. I included in the brief the quote that is from 1164. And this is one example. It took more than a year and only after the wireless telecommunications period determined that MCLM would run afoul of Brightline's spousal figure. On and on it goes, from MCLM to amendments to application to staff direction. Several weeks later, only in response to ongoing administrative litigation, MCLM made a brief announcement about it. I'm sorry, I don't know what you're saying. Maybe you're reading it in an incomprehensible way. I'm sorry. It's at page 26 of our opening brief. This is what the FCC stated. This is in 2011. So five years of grinding on. It took more than a year and only after the wireless telecommunications bureau determined that MCL had run afoul of the Brightline spousal attribution provision in section 1.2110 for MCLM to amend its application and staff direction. Several weeks later, and only in response to ongoing administrative litigation. Mr. Hossbeth, is this part of our record? It is, Your Honor. First you just have to make a reference to it. Yes, it's found in 8965, but it's also in our main brief on page 26. And it's quoted there. Yeah. Judge Loebert, I wish to reiterate a question that she gave you earlier. I had asked you in two sentences to tell us your claim, the summary of your claim under the FCC Act. Under the FCC Act? Yeah. Yes. Under the FCC. You told us under the antitrust laws what you thought. I apologize. I have a little knowledge about it. All right. Because I've told it for a lot of years. On the FCA, Judge Hayden relied on New England Telephone, a First Circuit decision. Six other circuits, the Fourth through the Ninth, had gone in the other direction. Key controlling precedent in this on section 201, that's more 401, on section 201 and 206 to 207 is a global crossing case. The global crossing case has this language. It's a violation of a regulation that lawfully implements section 201B's requirements is a violation of the statute. And what we're saying is the violations that occurred here are legion, not only the contour information, the lies that I was reading that quote from, the lies that MCOM itself made to the FCC to get very small business credit, then they lied about small business credit and tried to take the next step up. They lied about that, which enabled them to do a much lower bid. So your claim under the FC Act is that they lied to the FCC? Is that what you're saying? My claim is that they violated orders, they violated the protection rule, they violated regulations of the FCC, they filed submissions with the FCC claiming to have operations that they didn't have. Those filings were made under 18 U.S.C. section 1001, criminal penalties for violation of it. Those lies not only impacted the public interest and delayed rolling out life-saving technology, but they also impacted the plaintiffs in this action. And that's our point. And that's why as to the FCA claims decided on summary judgment, really that should go back to the district court for further consideration. That's just a wrong decision. So your FC, let me see if I can understand this. They're too numerous to say, but they made all these lies to the FCC, right? And your claim is that as a result of that, Havens was hurt. Now Havens, of course, is a pretty big player in this field. There's no question of that, Your Honor. And have you asked the FCC to take action on the basis of these lies? We have been going in as many different directions as we can, Your Honor, in all different directions to try to deal with this. But the point is, on these specific claims, we have a right to choose either to go to the FCC or to go before the federal courts. The choice was made to go before the federal courts on these specific claims, and that's what we did. Well, wouldn't the federal courts say, if you lie to the FCC, we rely on the FCC to be able to remedy that? Your Honor, the FCC has literally thousands, if not tens of thousands, of licensees. I have all the radio stations in the country. And there's an awful lot of stuff to police. That's why when the FCA was enacted, Congress went to great lengths to make sure that there would be a right to go to federal court, because they recognized the FCC, good agency, overloaded with things to do. You're not saying the FCC is part of the conspiracy, are you? No, of course not, Your Honor, absolutely not. Did you try to get an injunction under the injunctive act, under the provision that provides for injunctions? Section 401. We saw an injunction, yes, under that. We also saw damages under Section 206, 207, based on reasonable conduct under 201. Let me ask you this. Are the false representations that you claim give you a private right of action and the same false representations that you assert were committed before the FCC? Yes, they do in several different ways. No, no, I just wanted that. Are these the same representations that you say lay a basis for the concerted action conspiracy theory? That's correct, Your Honor. Okay, just curious. Okay, thank you very much. Thank you, Your Honor. Oh, I'm sorry. Was I wrong? No, no, thank you. Will you have a little rebuttal? I think you gave me a little bit of extra time. Well, I think he asked for five minutes. Mr. Moriello? May it please the Court, Robert Moriello. Please get before the... I apologize, Your Honor. May it please the Court. Because it goes on the tape. Absolutely. I'll start again. May it please the Court. Maybe a tape is the wrong word nowadays. A disc. May it please the Court. Robert Moriello, and with me at counsel table, Kelly Hastie, on behalf of the defendant-respondent Maritime Communications Land Mobile. Not surprisingly, I have a very different view of what proceeded before Judge Hayden than my learned colleague. Isn't your PSI another defendant? PSI was a defendant, Your Honor. And they did settle before trial in a confidential settlement agreement that I don't know the terms of. It seemed to me a little bit unfair that Mr. Hudspeth, in argument, was trying to spout out those terms when they weren't part of the record before the trial court, they weren't part of the trial, and really they were of no consequence because this case was very carefully case managed. We went through 11 case management orders, first with Magistrate Schwartz, now a sister judge on this court, and then with Magistrate Waldor, from MCLM's perspective, endured a trial by ambush because- MCLM. MCLM is short for Maritime Communications Land Mobile. I apologize, Your Honor. And those are the two competing groups, right? Havens on one hand and MCLM on the other. That's correct, Your Honor. I'll use Havens for purposes of this appeal because the plaintiffs in this case are Havens and a series of entities that Mr. Havens admits that he controls, including a not-for-profit where the for-profit entities transfer pieces of certain licenses to the not-for-profits so they could all try to do business together. But as I was saying, this case was carefully case managed. We went to trial with the plaintiff identifying 7,500 trial exhibits, which he winnowed down to 6,500 trial exhibits, which Magistrate Waldor went back and said, again, it should be something less than that, to which they identified over 400 trial exhibits. And if Your Honor can imagine, all these clerks and interns in the back of the courtroom were not in that courthouse, but boxes upon boxes of documents were sitting in the back of that courthouse at the start of the trial, through the completion of the trial. So all these people are substitutes for boxes? That's correct, Your Honor. We waited. The plaintiff required us. The defendant in this case, NCLM, identified 60 trial exhibits. That's a lot of boxes. It was a lot of boxes, Your Honor. The plaintiff identified ultimately for trial over 400 trial exhibits, which, like I said, filled the back of the courtroom. How long was the trial? The trial was a nine-day bench trial. And as the court has already said, Judge Hayden had the opportunity to assess the credibility of every single witness. She sat there patiently and allowed plaintiff to put in his entire case. Judge Hayden allowed the plaintiff to call all of my witnesses on their case in chief. Judge Hayden allowed the plaintiff to introduce whatever documents the plaintiff wanted to introduce for purposes of establishing just the first element of the Sherman Act claim, which was the alleged conspiracy. And ultimately, after Judge Hayden had the opportunity to assess all of the evidence, the documents, the testimony, Mr. Havens was on there for days, Mr. Reardon was on there for days, and this supposed surprise lie, which was Docket Entry 287, which, Your Honor, Judge Fuentes already said and recognized was before Judge Hayden. She allowed that post-trial submission to come into the record, and she still found no evidence of any concerted action between MCLM and PSI. Okay, that's the antitrust case. That's correct, Your Honor. All right, let's shove that aside. Okay, Your Honor. Now, what about the FCC case? Your Honor, and I think it's important, the opinion that Judge Hayden entered dismissing the FCC claim was particularly appropriate for dismissal here, because the first aspect of this is that, and it's located at page three of Judge Hayden's original decision, the 2011 motion to dismiss decision, and Judge Hayden recognizes that the distance for where the site-based license versus the geographic license, the distance for that range, as the court was talking about, was the shorter of 120 kilometers and the actual transmitting distance of the site-based station, and that comes from 47 CFR section 80.385. And that's identified in Judge Hayden's original opinion. In that opinion, and based upon the CFR, the plaintiff already knows, that for it to create a station, the distance should be outside of that 120-kilometer range. And that's a range around the site. And most of these sites run up and down, the site-based licenses run up and down the East Coast. They run up and down the Mississippi River. The locations of the NCLM site-based licenses are well within the record before this court. But, of course, it could be closer to the site if it knew the signal contours. That's correct, Your Honor. And that's where the cooperation orders, that's where I was getting to, which is the cooperation orders from the FCC, they say that the site-based licensee should cooperate to avoid or resolve interference issues. And so it's incumbent upon the plaintiff here, Mr. Havens, to identify, are you going to try to build a site within the 120-kilometer range? Because if you're within that range, then we have to talk. And Mr. Reardon testifies to this extensively during the trial. So the court should be comfortable with... Is it not the case, though, that he requested that information but never got the answers to those questions? Your Honor, he asked to meet with us, there's no doubt. And what we said was, we have, here's our site-based licenses. If you have a site that you're choosing to build upon that's within 120 kilometers, come talk to us. Sounds like who's going to go first? There is a little bit of that, too, Your Honor, but that's the cooperation aspect. I mean, as I teach my children, cooperation is a two-way street. Go play, go people cooperate. I mean, I've never heard of competitors being told that they have to cooperate. I agree with you, Your Honor, and that's the difficult part of this, is if you look at the timing of when all of this is happening, we're already in litigation with Mr. Havens in California. We're already in litigation with Mr. Havens in the FCC. We're already in litigation with Mr. Havens here in the District of New Jersey. To ask us to go on a fool's errand to say, well, wait a minute, tell me if your range is anywhere within this 120 kilometers doesn't make sense. If he chooses a spot, and if we say, for example, our site-based license in Rehoboth, Massachusetts, if he says, I want to build a site that's not 120 kilometers, not more than 120 kilometers out, because he's free to do that, but he says, I want to build it 100 kilometers out, that's when we have something to talk about, right? That means that you know what the range is. You already know, don't you, what your range is or is going to be, so that when he asks, what is your range, you could simply tell him, this is what our range is or is going to be. That's right, Your Honor, and he knows our range, which is 120 kilometers, because that's what the FCC describes. That's the outside parameter, isn't it? Well, that's right. If that's the outside parameter, and again, I think Judge Slover has hit the nail on the head here, what he's trying to do is to say to you, if you go to, you know, if you need to tell me everywhere within that 120-kilometer range, I apologize, I'm going to say miles probably more than once, if you go anywhere within that range, and that's a huge range when you think about it, 120 kilometers, you're talking roughly, you know, 70 miles or so. Are these TV stations or radio stations? They're radio, Your Honor. This is for, there's multiple purposes, and that was part of the trial, is how do you repurpose these licenses? Originally, they were radio. For example, MCLM is being accused of never having constructed stations. We purchased from Waterway, not we, Mobex purchased facilities, licenses from Waterway up and down the Mississippi, and the barges used to use our licenses to communicate ship to shore. That became irrelevant after the advent of cellular, and that's why Judge Hayden spent so much time both in her opinion and during the trial to deal with, how do you address the competition not just within the maritime license aspect, but also the satellite market, the cellular market, and Judge Hayden made explicit findings in the ultimate trial opinion that MCLM wasn't just facing competition from Havens with these geographic licenses. It was facing the strain of trying to operate a business that's competing with satellite and cellular, and so at some point, MCLM has to try to repurpose these licenses. Now, getting back to Your Honor's original question regarding the cooperation, what Judge Hayden and the plaintiffs here would describe as the cooperation orders, again, we felt like we did what we needed to do before the FCC. The FCC told us in a footnote to cooperate. Cooperate is a two-way street. If the plaintiff here had said, we want to build our site tower within that 120-kilometer range, we would have said, tell us your antenna strength, what is the range that you're looking to use, and let's see if there's a way to resolve that. But without that information, it's a fool's errand. It requires us to go to multiple points and to distract us from our business and to distract us from the litigations that he's bringing with us, bringing against us, and expend further resources. Did you actually have radio transmitters at these sites? We did, Your Honor, yes. All of your sites? Not all of these sites, Your Honor, and that's the subject of 287. And again, when you say all of these sites, it depends on when. 287 refers to what? The docket entry, the supposed admissions of lies that the plaintiff says. I'm going to ask you about those admissions of lies, but I don't know if you answered Judge Rothfield. We did, Your Honor. At many of these stations, we had identified construction, and the FCC was satisfied with that. You'll see in the record from Judge Hayden discussions of audits. And when I say we, this was actually done before MCLM purchased the licenses through an asset purchase agreement from Mobax. But MCLM, for certain of these site-based licenses, still has antennas there, still has folks operating at these licenses. And Mr. Reardon during trial said, you know, for us to disclose all this information to Mr. Hayden's, for example, in New Jersey, and I believe this is why the case was actually brought in New Jersey after it was originally brought in California. In New Jersey, MCLM is actually operating. It has a lease agreement with the New Jersey Turnpike Authority. And, for example, when the Super Bowl was ongoing, they were using, the Turnpike Authority was using those licenses, those dedicated licenses, to transmit radio so that it couldn't be interfered with. And if they had an emergency at the Super Bowl, that those licenses and radios would work. On the FCC claim, the plaintiffs say that the defendants made false representations to the FCC. That's their basis for a private right of action? That's their basis. You don't disagree with the fact that the FCC would, in some circumstances, allow a private right of action? The FCC would allow, in certain circumstances, a private right of action. But you need that order in the first instance. And that order in the first instance, as it's been laid out by the plaintiffs, are solely those cooperation orders. So private rights of actions can only be based on an FCC order? As I see the Third Circuit, whether it's Malinbaum or the First Circuit's decision in, I apologize, I'm losing the name. You disagree with the New England telephone case? You disagree with the idea that false or fraudulent statements would be a basis for a private right of action? I disagree with any false or fraudulent statements, just so Your Honor is clear. That's right, but we're talking about pleading, filing a complaint. Right, Your Honor. And in this instance, the supposed false or fraudulent allegations are nonexistent. I mean, what they're saying is- No, but you disagree. I'm talking about filing a complaint. Filing a complaint, having a private right of action on the basis of false representations to the FCC. No, and I think if there's an order or rulemaking that pertains to that supposed false representation, that there may exist a private right of action. But in this decision, in the motion to dismiss decision by Judge Hayden, Judge Hayden specifically says, this court need not even get there because the cooperation orders that we're talking about here don't prescribe or direct MCLM to do anything. All they say is that you need to cooperate to avoid and resolve interference issues. That's the order. That's what this case was about when it started, and that's what Judge Hayden resolved. The part that's getting mixed up here is the plaintiffs in this case, through the FCC, are alleging that there was some sort of spousal attribution for terms of a bidding credit at one of the auctions, auction 61. That has nothing to do with the site-based licenses. That has to do with the acquisition of geographic licenses. That proceeding is before the FCC, and Judge Hayden recognized that. All of these issues, just to sum up, all of these issues were before Judge Hayden. Judge Hayden had a full record before her honor. She had nine days of bench trial to consider all of the arguments the plaintiffs has made here, all of the opportunity to determine whether these were lies or not lies. Judge Hayden assessed the credibility of the witnesses, found no concerted action in her prior motion to dismiss opinion, was well-founded, should not be disturbed, and neither should the trial opinion. Wasn't that for the FCC to do? I'm a little surprised when you say it was for the judge. Wouldn't the FCC know whether some representation made that it was a lie or not? That's correct, Your Honor. The issue of the spousal attribution for the bidding credit is currently before the FCC. It really wasn't an issue. So what is the blockbuster disclosure? The blockbuster disclosure is what they've identified as Docket Entry 287, and there's nothing blockbuster about it, Your Honor. Your Honor's skepticism, at least as I'm hearing it, is consistent with mine. There are no lies in that. There's no admissions. That was all before Judge Hayden, and, in fact, it was all before the court as well. What is admitted? What they're saying is that as of a certain point, NCLM stopped operating certain site-based licenses, and the reason for that was clear. They were in bankruptcy, and they could no longer continue to pay for the site leases, the antenna costs, the electricity, et cetera, and they made a determination. In fact, Your Honor, this was all before the trial judge as well, and I'll find the sites. This Docket Entry 287 was actually extremely consistent with Exhibit P397, which is located at A558, Exhibit P464, which is at Appendix A566, and the joint motion between the Enforcement Bureau and my client in the FCC proceeding, which was Exhibit D104, which is located at Appendix 682, and all of the statements that are supposedly within this blockbuster admission post-trial, which Judge Hayden had the opportunity to consider, were all within the trial record before, Your Honor, already anyway. So she made findings of fact when she finished, right? She did. She made extensive findings of fact with citations to the record. All of that is within her 59-page opinion. Ms. Mariella, thank you very much. Thank you, Your Honor. Mr. Hartspey? Your Honor, if I may just say, with respect to the trial, I came in two weeks before the trial began to take over the trial of the action. So did SABRE. We cut those exhibits down enormously. There were 100 exhibits used by plaintiffs at trial. So just to put that issue to rest, Your Honor, the key point here is that as to more than 80 percent of the site-based stations that MCLM had or claimed to have, they have absolutely admitted after trial that they didn't have them. And they didn't have them for long periods of time. And Judge Hayden was made aware of this, right? And Judge Hayden. But the effect of that is enormous. Well, I mean, she was made aware of it before she wrote her opinion, right? That she had it before her, though it was well after the trial was done and everything was in, Your Honor. I think she had probably already written her opinion at the point this came out. Well, if she felt the need to change it, she could have changed it, right? I believe she could have, Your Honor, yes. But I'm not sure that without having that information explained and put before you to understand the context of it, that you necessarily jump to the conclusion. The problem here is on contour information, part of this conspiracy to withhold, on contour information, all they had to say was, we have no contour information as to 82% of these stations. Therefore, you don't have to protect anything. Therefore, you can build out as you want. It's not enough to say build out, you can build, if you stay 120 kilometers away from where our station is supposed to be located. That doesn't help you at all because that knocks out most of the geographic license areas, which they paid money, plaintiffs paid money to the FCC to get. And that's what's so outrageous here. If they had simply told the truth, what is in that order the FCC approved in March is included in a reply brief. Is it the case that if those site-based stations are not operational for a two-year period, they devolve to whoever has the geographic license? That's correct. Is it the case then that you have acquired some of those site-based stations as a result of that process? You're being havens. We haven't acquired, they basically disappeared because site-based was a grandfathering of a pre-existing AMTS system. Right, but if they don't set up, if they don't establish for a period of two years, they lose the site-based license. If they fail to construct, build out, and operate within a two-year period, they lose their site-based license. The problem is they were still claiming those licenses years and years after they failed to build them out. Can you go and look and see if anything's there? That's the problem, Your Honor. These things are on cell towers and all over the place. You don't know where to look. They say drive around. They say, as they figure it out, just drive a car around. You're never going to find anybody driving a car around, Your Honor, and that doesn't satisfy investors. So they don't have to register these licenses and locations with the FCC? I'm sorry, Your Honor? Don't they have to register these licenses, these locations with the FCC? Absolutely, and they file renewals of stations that have never been built out. They just thought they lied to them. Under 18 U.S.C. 101, they lied and lied and lied. They filed these renewals for what they finally admitted never existed. Did the FCC get there if they lied and there were no stations and they said we have stations at this point, this point, this point? The FCC doesn't send people around to see if they have them? Your Honor, they've tried, but it's very, very hard to do. Well, we all do things that are hard to do. It's a job. If you know, in MCL's position, that 82% of what you're claiming doesn't exist, it takes a dozen words to say that. It doesn't take thousands of dollars' worth of engineering surveys. It takes nothing but telling the truth, and that's what MCLM was incapable of doing, and PSI, the same thing. They tried to play a game. They played a shell game, like Lansdowne, Fourth Circuit. The court there says what they did, they were playing a scheme against the FCC, and they succeeded in doing it over years. There was a filing that MCLM made. And the district court was made aware of all this. The district court was made aware of all this. Your Honor, I think I have to say the district court was aware of this, but I don't, and I respectfully say again, I do not think the district court appreciated what the importance of those admissions were, because they came after the trial and the action. There was no opportunity to do the explaining that I'm doing here for you to put them in context. And may I say also that the submission that was made by MCLM last week, I mean, that, you know, there were two things. There's a California action, the judge last week in that action said he doubted the claims had much substance to them, and that he wasn't going to act on any immediate receivership issue that was raised there. On the other thing that relates to – You have to finish up, Mr. Hussbeth. You want to finish up, please? I'm sorry? You want to finish up, please? Your red light is over here. And the other thing related to something involving administrative law, Judge Sippel, which is, in fact, subject to a motion for reconsideration in which he actually gave instructions to file the very thing that was filed by the Chadbourne Law Firm. Again, these are non-issues. I don't know why they were cited. What I would call to the court's attention is a very good rule of reason opinion that just issued in the King drug case involving reverse patent – reverse settlements, I think they're called, reverse monetary settlements and patent litigation. Very, very interesting rule of reason standards in their application. Yeah, I know about that. Yeah, I was going to say that. I didn't write it, but I was on the panel. It's a very good decision on that. I wrote it. It's been reversed in act of it. Oh, right, yeah. Sounds like we're familiar with the case. Mr. Hussbeth, we have to finish up. Thank you very much. Thank you very much for your time. I appreciate it. Ms. Morrello, thank you very much also. Thanks, everyone, and the foul boxes in the courtroom. You know, I'm prettier than most of the foul boxes I get. Your box is now, I think, the closest. I can go on if you want.